**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

---

ESTATE OF RANDY ASHLAND,

Plaintiff,

Case No. 2:20-cv-01640-PP

vs.

CITY OF WAUKESHA, IAN DEKARSKE, RYAN SOLBERG, and SERVANDO BENITEZ,

Defendants.

---

# AMENDED COMPLAINT

---

## INTRODUCTION

1. The Constitution allows a police officer to use deadly force against someone only if that person puts the officer or another in imminent danger or actively resists arrest under circumstances warranting deadly force. *Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015). Just holding a gun does not make one an imminent danger. *Id*. (affirming denial of summary judgment based on qualified immunity to officer who confronted and shot a suicidal man holding a shotgun in his lap).

2. Officers Ian DeKarske and Ryan Solberg shot and killed Randy Ashland as he was following police orders to get rid of his gun, which he had never pointed at anyone but himself. Ashland had his hand over the top of the gun, holding it by the cylinder, and he was tossing it away. His hand was not on the gun's grip nor his finger on the trigger. Ashland could not have shot DeKarske, Solberg, or anyone else.

3. Many other officers on scene appear to have realized this. Thirteen other officers were with DeKarske and Solberg, including Servando Benitez. Together they were surrounding

Ashland from positions of cover. Some of them, like DeKarske and Solberg, had Ashland at gun point. Not one of those other officers fired a single bullet.

4. After shooting Ashland, DeKarske and Solberg allowed him to go more than five minutes without medical care, while he lay bleeding to death. By the time he received care, it was too late.

5. Because Ashland was an imminent danger to no one, the use of deadly force against him violated his constitutional rights. The failure to provide Ashland with prompt medical care after he was shot was another violation of Ashland's constitutional rights.

## Jurisdiction & Venue

6. This court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Estate's claims under 42 U.S.C. § 1983 arise under federal law.

7. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## Parties

8. **Plaintiff Estate of Randy Ashland** is a legal entity with the capacity to sue and acts by court-appointed personal representative Jay C. Ashland, who is Randy Ashland's adult son.

9. **Defendant City of Waukesha** is a Wisconsin municipality.

10. **Defendant Ian DeKarske** is a sergeant in the Waukesha Police Department.

11. **Defendant Ryan Solberg** is an officer in the Waukesha Police Department.

12. **Defendant Servando Benitez** is a sergeant in the Waukesha Police Department.

## ALLEGATIONS

### *Randy Ashland*

13. Randy Ashland was born in Milwaukee in 1961.

14. He married and had three boys, all now grown. They have given him three grandchildren.

15. Ashland was a builder and handyman his whole adult life.

16. Because of workplace injuries to his back, Ashland spent the final years of his life in increasing pain.

17. Ashland fought the pain, but it persisted.

18. He found comfort in his relationships with his three sons and as an active member of Brookside Baptist Church, volunteering there and taking part in the community.

19. There, he met Pastor John Fallahee, who would try to save his life the night he died.

### *Pastor John Fallahee Rushes to Save Randy Ashland's Life*

20. The social restrictions put in place to fight the COVID-19 pandemic cut Ashland off from the comforting routines of his faith community.

21. Several weeks into lockdown, he texted Fallahee at around 10:00 p.m.

22. Ashland's messages were ominous.

23. Fallahee feared that Ashland was going to kill himself, so Fallahee got in his car and raced to Ashland.

24. He arrived at Ashland's home shortly after midnight.

25. Sitting in his car outside, he spoke to Ashland on the phone for about 20 minutes.

26. Fallahee persuaded Ashland to come out to him.

27. Ashland came out of his home with a handgun and got in Fallahee's car.

28. Ashland told Fallahee that he was deciding whether to shoot himself and that he was not going to shoot anyone else.

29. Fallahee drove Ashland to Waukesha Memorial Hospital to get help.

30. They arrived after 1:00 a.m.

31. When they arrived at the hospital, Fallahee asked Ashland to leave the gun and go inside.

32. Ashland refused to go inside without his gun.

33. Fallahee feared that security guards would shoot Ashland if he entered the hospital with the gun, so Fallahee went inside to get help, leaving Ashland in the car.

34. Fallahee explained the situation to hospital security. They summoned the police and locked down the hospital.

***DeKarske and Solberg Shoot and Kill Ashland***

35. Dispatch put out a call for a "man with gun to his head" at the hospital.

36. Several officers were already nearby.

37. Several other officers were, by coincidence, already at the hospital.

38. Within minutes of dispatch sending out its call, 15 officers responded to the scene, including Sergeants Ian DeKarske and Servando Benitez and Officer Ryan Solberg of the Waukesha Police Department.

39. Neither DeKarske nor Solberg had crisis intervention training.

40. Crisis intervention training prepares officers to deal with emotionally unstable subjects in crisis, like Ashland, by using proven techniques to calm and de-escalate the subject.

41. The Waukesha Police Department does not provide crisis intervention training to all its officers.

42. And it has no policy or standard operating procedure specifically for dealing with suicidal subjects.

43. When the first officers arrived at Waukesha Memorial, Ashland was still in the parking lot.

44. He was laying on his back next to Fallahee's car.

45. The car was to his immediate left.

46. His head was to the north, away from the hospital, his feet were to the south, pointing toward the hospital and the officers.

47. There were lights in the parking lot.

48. There were lights from the squad cars.

49. And some of the officers were shining handheld and rifle-mounted flashlights at Ashland.

50. The officers all took cover.

51. Some took cover behind parked police SUVs.

52. Others took cover behind thick, concrete pillars outside the ER entrance.

53. The officers were about 50 feet away from Ashland.

//

//

//

54. This screenshot from hospital surveillance video shows the relative positions:




55. Other than Ashland and the officers, the parking lot was deserted.

56. The officers could see that Ashland had his gun pointed at his own face.

57. No single officer took control of the situation.

58. No single officer attempted to use de-escalation techniques meant for suicidal or mentally ill subjects.

59. Solberg asked Ashland his name and asked Ashland to put his gun down.

60. Other officers also shouted at Ashland to put his gun down.

61. Ashland shouted back that he did not want to hurt the officers.

62. The officers, including Solberg and DeKarske, heard Ashland say that he did not want to hurt them.

63. Ashland did put his gun down as the officers requested.

64. He put it down near the right side of his body, in or on his right armpit.

65. The officers shouted at Ashland to raise his hands.

66. Ashland did raise his hands.

67. The officers shouted at Ashland to roll away from the gun.

68. Ashland could not roll away from the gun.

69. He could not roll left because the car was to his left.

70. He could not roll right because the gun was there. Rolling to the right would mean rolling toward the gun, not away from it.

71. Because he could not roll away, Ashland attempted to throw the gun away.

72. Ashland reached across his body and picked up the gun with his left hand.

73. He picked up the gun by the cylinder.

74. He did not grasp it by the grip.

75. He did not put his finger on the trigger.

76. With that hold on the gun, he could not have fired it.

77. The officers could see how Ashland was holding the gun.

78. Ashland extended his left arm to throw the gun away from his body.

79. He was not taking aim.

80. The barrel of the gun was pointing due west, away from all the officers, who were to the south.

81. DeKarske and Solberg opened fire just after Ashland picked up the gun.

82. Solberg fired twice.

83. DeKarske fired five times.

84. Those shots inflicted ten gunshot wounds on Ashland’s body.

85. At the time DeKarske and Solberg opened fire, as many as 7 other officers were also holding Ashland at gun point.

86. Not one of those other officers fired a gunshot.

***DeKarske, Solberg, and Benitez Fail to Provide Ashland with Medical Care***

87. While he was being shot, Ashland rolled onto his stomach and then onto his back, coming to rest on the ground by the time the gunfire stopped.

88. Ashland lay completely still after he was shot with his empty hands folded on his chest.

89. Solberg yelled commands at Ashland after he was shot. Ashland was completely nonresponsive.

90. Solberg, DeKarske, and Benitez could see that Ashland was not moving after he was shot.

91. Solberg, DeKarske, and Benitez could see that Ashland was not holding a weapon after he was shot.

92. Solberg, DeKarske, and Benitez could see that Ashland was struggling to breath after he was shot.

93. Solberg, DeKarske, and Benitez could see that Ashland was seriously injured by the gunshots.

94. After more than four minutes, a group of officers not including Solberg, DeKarske, or Benitez approached Ashland.

95. The officers rolled Ashland from his back to his stomach and handcuffed him behind his back.

96. Benitez and DeKarske were the only sergeants present on the scene. They were responsible for supervising the response and directing the officers' actions during and after the shooting.

97. DeKarske and Benitez took no action to ensure Ashland received prompt medical care after he was shot.

98. Solberg took no action to provide Ashland with prompt medical care after shooting him.

99. More than five minutes after he was shot, a group of officers finally brought Ashland into the emergency room for care.

100. He died from his wounds soon after.

## Claims for Relief

### First Claim

*Excessive Force Against Arrestee, 42 U.S.C. § 1983*
(Fed. Civ. Jury Inst. of the Seventh Circuit No. 7.09)
Estate of Randy Ashland v. Ian DeKarske

101. The plaintiff realleges here all previous allegations.

102. Under the Fourth Amendment to the United States Constitution, a police officer may not use excessive force against an arrestee.

103. Deadly force is excessive force unless the arrestee puts another person in imminent danger or is actively resisting arrest and the circumstances warrant deadly force.

104. DeKarske used deadly force against Ashland.

105. That force was excessive because Ashland was not placing anyone in imminent danger or actively resisting arrest when DeKarske shot him.

106. DeKarske was acting under color of law when he shot Ashland.

107. Ashland is therefore entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and a declaration that DeKarske violated his constitutional rights.

**Second Claim**

*Excessive Force Against Arrestee, 42 U.S.C. § 1983*
(Fed. Civ. Jury Inst. of the Seventh Circuit No. 7.09)
Estate of Randy Ashland v. Ryan Solberg

108. The plaintiff realleges here all previous allegations.

109. Under the Fourth Amendment to the United States Constitution, a police officer may not use excessive force against an arrestee.

110. Deadly force is excessive force unless the arrestee puts another person in imminent danger or is actively resisting arrest and the circumstances warrant that degree of force.

111. Solberg used deadly force against Ashland.

112. That force was excessive because Ashland was not placing anyone in imminent danger or actively resisting arrest when Solberg shot him.

113. Solberg was acting under color of law when he shot Ashland.

114. Ashland is therefore entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and a declaration that Solberg violated his constitutional rights.

**Third Claim**

*Denial of Medical Care to Arrestee, 42 U.S.C. § 1983*
(Fed. Civ. Jury Inst. of the Seventh Circuit No. 7.11)
Estate of Randy Ashland v. Ryan Solberg

115. The plaintiff realleges here all previous allegations.

116. Under the Fourth Amendment to the United States Constitution, a police officer must provide medical care to an injured arrestee.

117. Ashland was under arrest when Solberg and DeKarske shot him.

118. Ashland needed medical care after Solberg and DeKarske shot him.

119. Solberg failed to take action to provide adequate medical care to Ashland.

120. Solberg's failure to take action to provide Ashland with medical care was unreasonable because any officer in his position would have known Ashland was gravely injured, required immediate medical attention, was incapable of causing any harm, and that immediate trauma care was available in the adjacent emergency room. Considering those circumstances, it was unreasonable for Solberg to stand by while other officers spent minutes slowly approaching Ashland, moving his body, and handcuffing him behind his back before finally bringing him into the hospital.

121. Ashland suffered extreme pain because he received inadequate medical care.

122. Solberg's failure to provide Ashland with adequate medical care caused Ashland's death.

123. Solberg was acting under color of law when he failed to provide Ashland with adequate medical care.

124. Ashland is therefore entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and a declaration that Solberg violated his constitutional rights.

## <u>Fourth Claim</u>

*Denial of Medical Care to Arrestee, 42 U.S.C. § 1983*
(Fed. Civ. Jury Inst. of the Seventh Circuit No. 7.11)
Estate of Randy Ashland v. Ian DeKarske

125. The plaintiff realleges here all previous allegations.

126. Under the Fourth Amendment to the United States Constitution, a police officer must provide medical care to an injured arrestee.

127. Ashland was under arrest when Solberg and DeKarske shot him.

128. Ashland needed medical care after Solberg and DeKarske shot him.

129. DeKarske failed to take action to provide adequate medical care to Ashland.

130. DeKarske's failure to take action to provide Ashland with medical care was unreasonable because any officer in his position would have known Ashland was gravely injured, required immediate medical attention, was incapable of causing any harm, and that immediate trauma care was available in the adjacent emergency room. Considering those circumstances, it was unreasonable for DeKarske to stand by while other officers spent minutes slowly approaching Ashland, moving his body, and handcuffing him behind his back before finally bringing him into the hospital.

131. Ashland suffered extreme pain because he received inadequate medical care.

132. DeKarske's failure to provide Ashland with adequate medical care caused Ashland's death.

133. DeKarske was acting under color of law when he failed to provide Ashland with adequate medical care.

134. Ashland is therefore entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and a declaration that DeKarske violated his constitutional rights.

## **Fifth Claim**

*Denial of Medical Care to Arrestee, 42 U.S.C. § 1983*
(Fed. Civ. Jury Inst. of the Seventh Circuit No. 7.11)
Estate of Randy Ashland v. Servando Benitez

135. The plaintiff realleges here all previous allegations.

136. Under the Fourth Amendment to the United States Constitution, a police officer must provide medical care to an injured arrestee.

137. Ashland was under arrest when Solberg and DeKarske shot him.

138. Ashland needed medical care after Solberg and DeKarske shot him.

139. Benitez failed to take action to provide adequate medical care to Ashland.

140. Benitez's failure to take action to provide Ashland with medical care was unreasonable because any officer in his position would have known Ashland was gravely injured, required immediate medical attention, was incapable of causing any harm, and that immediate trauma care was available in the adjacent emergency room. Considering those circumstances, it was unreasonable for Benitez to stand by while other officers spent minutes slowly approaching Ashland, moving his body, and handcuffing him behind his back before finally bringing him into the hospital.

141. Ashland suffered extreme pain because he received inadequate medical care.

142. Benitez's failure to provide Ashland with adequate medical care caused Ashland's death.

143. Benitez was acting under color of law when he failed to provide Ashland with adequate medical care.

144. Ashland is therefore entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and a declaration that Benitez violated his constitutional rights.

**Sixth Claim**

*Liability of a Municipality for Failure to Train, 42 U.S.C. § 1983*

(Fed. Civ. Jury Inst. of the Seventh Circuit No. 7.25)

Estate of Randy Ashland v. City of Waukesha

145. The plaintiff realleges here all previous allegations.

146. The City of Waukesha Police Department's training program is not adequate to train its officers to properly handle calls involving suicidal and other mentally ill subjects because, among other reasons, it has no policy specific to this need on which to train officers, it fails to require all officers to attend crisis-intervention training, and it fails to require that only officers with crisis intervention training lead the response to suicidal and mentally ill subjects.

147. Waukesha's two police chiefs during the relevant years knew that it was highly predictable that their officers would encounter suicidal and other mentally ill subjects and use excessive force against them without adequate training and policies. They knew this for at least these reasons:

148. First, the risk was obvious.

149. Second, Ashland was the third suicidal subject shot and killed by Waukesha police officers in just the last several years. Waukesha's police leaders were aware of those high-profile killings because it is written policy to notify them immediately of officer-involved killings. Officer Bradley Condon shot and killed Ted Schmitz in 2019. Officer Condon had not had crisis intervention training at the time. Officers Chelsea Coenen and Benjamin Stern shot and killed William Brewster in 2017. Stern had not had crisis intervention training at that time. He opened fire on Brewster. Stern opening fire led Coenen, who had had some training, to open fire as well.

150. Third, police associations and groups sent Waukesha and its chiefs dozens of advertisements and educational flyers emphasizing the importance of crisis intervention training and its de-escalation techniques in dealing with suicidal and mentally subjects. These materials uniformly claim that suicidal and other mentally ill subjects are at risk of death or serious injury from police officers who lack de-escalation skills and training. This material recognizes what has

become apparent to the law enforcement community in recent years. Successfully dealing with the mentally ill requires specialized skills and that dealing with the mentally ill without those skills can lead to injury for both subject and officer.

151. Fourth, on information and belief, Waukesha officers have had other non-fatal use-of-force incidents involving suicidal or mentally ill subjects and these incidents would have put Waukesha's police chiefs on notice of the need for specific policies and training on those policies and crisis intervention.

152. Waukesha's failure to provide adequate training to officers DeKarske and Solberg caused them to violate Ashland's rights by shooting him. Had Waukesha properly trained them, they would have been able to evaluate the situation appropriately and de-escalate the situation safely.

153. Ashland is therefore entitled to compensatory damages, punitive damages, pre- and post-judgment interest, attorneys' fees and costs, and a declaration that the City of Waukesha violated his constitutional rights.

## **Seventh Claim**

*Indemnification, Wis. Stat. § 895.46*

Estate of Randy Ashland v. City of Waukesha

154. The plaintiff realleges all previous allegations here.

155. Waukesha is responsible to defend and satisfy any judgment against its officers.

//

//

//

## PRAYER FOR RELIEF

156. The Estate of Randy Ashland prays for a judgment with the following relief:

a. Compensatory damages in an amount determined by a jury

b. Punitive damages in an amount determined by a jury

c. All allowable pre- and post-judgment interest

d. Reasonable attorneys' fees and costs

e. A declaration that defendants' conduct was unlawful

f. All other relief the Court finds just

Dated: January 24, 2022

Respectfully submitted,

/s/ Alison R. Leff

Thomas R. Kayes, Ill. Bar No. 6315461
Alison R. Leff, Ill. Bar No. 6296422
LAW OFFICE OF THOMAS R. KAYES, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
t. 708.722.2241
tom@kayes.law
alison@kayes.law

Matthew Pinix, State Bar. No. 1064368
PINIX LAW, LLC
1200 E Capitol Dr, Ste 360
Milwaukee, WI 53211
t. 414.963.6164
f. 414.967.9169
matthew@pinixlaw.com

Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Estate of Randy Ashland demands a trial by jury under Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 24, 2022

Respectfully submitted,

/s/ Alison R. Leff

Thomas R. Kayes, Ill. Bar No. 6315461
Alison R. Leff, Ill. Bar No. 6296422
LAW OFFICE OF THOMAS R. KAYES, LLC
2045 W Grand Ave, Ste B, PMB 62448
Chicago, IL 60612
t. 708.722.2241
tom@kayes.law
alison@kayes.law

Matthew Pinix, State Bar. No. 1064368
PINIX LAW, LLC
1200 E Capitol Dr, Ste 360
Milwaukee, WI 53211
t. 414.963.6164
f. 414.967.9169
matthew@pinixlaw.com

Attorneys for Plaintiff


Case 2:20-cv-01640-PP Filed 01/25/22 Page 17 of 17 Document 32